# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

Susan E. Peterson,

                **Plaintiff,**

v.                                   **Case No. 03-2329-JWL**

R.L. Brownlee, Acting Secretary,
Department of the Army,

                **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff filed suit against her employer alleging multiple violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., based on the conduct of her supervisor. This matter is presently before the court on defendant's motion for summary judgment (doc. 46). As set forth in more detail below, the court grants in part and denies in part the motion.

## I.      Facts

The following facts are related in the light most favorable to plaintiff, the nonmoving party. Plaintiff Susan E. Peterson, a civilian, was and continues to be employed by the defendant as a military analyst or "action officer" with the Training and Doctrine Command (TRADOC) Program Integration Office–Army Battle Command and Battle Command Training Team at Fort Leavenworth, Kansas. In December 1997, Lieutenant Colonel (LTC) Michael Ammel was assigned as plaintiff's supervisor. Plaintiff was the only civilian of approximately 10 to 14 military personnel employees supervised by LTC Ammel. Except for a three-month period when

one other female employee, Major Lisa Buchalski, worked under LTC Ammel's supervision, plaintiff was the only female employee working under LTC Ammel's supervision.

Ms. Peterson alleges that LTC Ammel, from December 1997 until the time when plaintiff was reassigned to a different superviser in August 1999, subjected her to a continuing course of discrimination and harassment based on her sex and, after she complained about his conduct, retaliation.   She filed two formal Equal Employment Opportunity (EEO) complaints against defendant, comprising a total of thirty-four (34) separate allegations.   Her first formal complaint, filed on April 19, 1999 sets forth thirty-three (33) allegations and one additional allegation is set forth in her second formal complaint, filed on August 6, 1999.   As plaintiff purports to set forth a separate claim based on each of these allegations, the court will set forth those allegations here.

According to plaintiff, on two occasions in December 1997, LTC Ammel placed his hand on plaintiff's right shoulder for thirty seconds.   Later that same month, LTC Ammel touched plaintiff's leg for twenty to thirty seconds during a meeting.   Plaintiff advised LTC Ammel that he could not touch her.   It is uncontroverted that LTC Ammel never touched plaintiff again.   In January 1998, LTC Ammel referred to plaintiff as "honey," "darling" and "llama mamma."[1]   It is unclear from the record how often LTC Ammel used these words during January 1998.   Shortly thereafter, plaintiff advised LTC Ammel that he could not call her names such as "honey," "darling," or "llama mamma."   It is uncontroverted that LTC Ammel never called plaintiff "honey" or "darling" at any time after January 1998.   It is also uncontroverted that LTC Ammel never referred to plaintiff

---

[1]Plaintiff raises llamas, has pictures of llamas in her office at work, and wears a necklace with a llama charm.

using any other word that might be construed as gender-based, other than "llama mamma" which plaintiff contends he used "several times" after January 1998.

Beginning in December 1997 and continuing until March 1998, LTC Ammel did not permit plaintiff to perform action officer work on a training support package. He assigned her the tasks of mailing copies, taking material to the Media Support Center for copying and picking up finished products. Throughout the first half of 1998, LTC Ammel routinely skipped over plaintiff in staff meetings. According to plaintiff, another "ongoing" problem she experienced with LTC Ammel was his failure to keep her apprised of "what was going on in the office." While he sent numerous e-mails to Captain David Overton (plaintiff's coworker with whom she shared an office) concerning work-related issues, he did not forward these e-mails to plaintiff or otherwise copy her on correspondence.

In early March 1998, plaintiff allegedly hurt her back due to the angle between her desk and her computer. LTC Ammel doubted that plaintiff had hurt her back and advised her that he would call for an investigation if she filed an injury form. LTC Ammel told other employees at a meeting that plaintiff was "pulling a fast one" regarding her injury. On March 25, 1998, LTC Ammel told plaintiff that he wanted her to go to a meeting at Fort Hood for the purpose of typing the substance of comments made at the meeting for later organizational use in the production of a staff leaders' guide. Plaintiff objected and was not required to attend the meeting. On April 27, 1998, LTC Ammel sent plaintiff an e-mail asking her to set up a conference. When plaintiff asked LTC Ammel "when he wanted it, who he wanted it with and what the subject was," LTC Ammel replied that if she was a good action officer she would be able to take what was sent and "run with it." That

3

same month, LTC Ammel told plaintiff that he had discovered something that she was good at–typing.

In May 1998, plaintiff was having a conversation with Major Buchalski in which Major Buchalski was remarking about how much work she had to do and that she missed the help she had when she was stationed in Korea.  LTC Ammel overheard the remark and said, "It sounds like you need a wife."  In June 1998, in front of the entire division, LTC Ammel told plaintiff that he was going to have to rely on her as an action officer because Captain Overton was going to be out of the office.  Plaintiff advised him that she was, in fact, an action officer.  Just days later, LTC Ammel advised Captain Overton that Captain Overton could not take leave because he himself had to be out of the office and there would no one left in the office to answer questions.  Plaintiff, who was going to be in the office during that time period, then asked LTC Ammel when he was going to start treating her like an action officer rather than an administrative person.  She also told him that he did not treat her the same as he treated Captain Overton or Major Buchalski.  LTC Ammel told her that she was too sensitive.  On one occasion during the summer of 1998, plaintiff, Captain Overton and LTC Ammel were discussing fumes in the office after the office was sprayed for insects.  LTC Ammel stated, "If a woman put that behind her ears, it would turn me on."

In October 1998, LTC Ammel yelled at plaintiff and called her a "bureaucrat" after she refused his request to do "illegal things in regards to contractors."  LTC Ammel did not close the door, so other employees in the office heard him yelling at plaintiff.  Plaintiff was very upset by the altercation and, several days later, plaintiff's husband came to the office to see LTC Ammel to discuss the fact that plaintiff was upset and to try to "smooth things" over with LTC Ammel.

4

LTC Ammel refused to discuss with plaintiff's husband any matters concerning plaintiff. After some period of time in which plaintiff's husband continued to urge LTC Ammel to discuss plaintiff and LTC Ammel continued to refuse to discuss plaintiff, LTC Ammel walked over to where plaintiff's husband was sitting and advised him that if he had to "throw him out he would." Several days later, LTC Ammel spoke to plaintiff in a "boisterous" manner during a conversation that they were having about plaintiff's position description and standards.

In November 1998, plaintiff was preparing to leave the office for a one-week trip to Fort Hood. Less than one hour before the shuttle was scheduled to pick her up to go to the airport, LTC Ammel came into plaintiff's office to discuss the standards relating to her position–standards that plaintiff had been wanting developed since she was assigned to the Training Program Integration Office. LTC Ammel asked plaintiff to sign the standards before she left for the airport. Plaintiff refused to do so as she disagreed with some of the verbiage used in the standards. According to plaintiff, LTC Ammel then verbally threatened her by threatening to change her flight if necessary because he wanted her to sign the standards before she left. Ultimately, plaintiff did not sign the standards before she left and, as she was leaving, LTC Ammel issued to plaintiff a letter of reprimand in which he accused her of "cheating" on her time sheets. LTC Ammel further expressed concern over document preparation and plaintiff's failure to complete several projects. According to plaintiff, this reprimand was issued just one week after she had a meeting with Colonel Bessler to discuss her problems with LTC Ammel.

Later that month, plaintiff sent an e-mail to LTC Ammel with questions regarding a contract. LTC Ammel told plaintiff that he had responded directly to the contractor. The

contractor, however, told plaintiff that he had not spoken with LTC Ammel that day.   In late November 1998, LTC Ammel was speaking with plaintiff about the standards for her position.   As part of the standards drafted by LTC Ammel, plaintiff was required to "replicate documents and mail them as needed."   When discussing this particular task, LTC Ammel told plaintiff, "You are good at doing this kind of work, but you are not good at anything else."   LTC Ammel also advised plaintiff that he wanted her to finish the standards for review by the close of business, but he returned just one hour later and expected the standards to be finished then.

On December 1, 1998, LTC Ammel asked plaintiff to make an appointment for plaintiff to brief a colonel; LTC Ammel, however, did not tell plaintiff the subject to be briefed at the meeting. LTC Ammel also sent a note to plaintiff advising her to contact a certain group about various issues.   When plaintiff did so, she was told that LTC Ammel had already contacted the group and had asked the same questions that plaintiff was asking.   On another occasion, LTC Ammel requested that the timekeeper obtain a form for plaintiff to use to sign in everyday, although the proposal was never implemented.   On December 21, 1998, plaintiff advised LTC Ammel that she would be taking the afternoon of December 24, 1998 off because President Clinton had signed an executive order giving federal employees the afternoon off.   LTC Ammel then asked her what type of leave she would be taking.   Plaintiff responded, "None."   LTC Ammel then stated, "I want to know what kind of leave you are using."   Plaintiff responded that she did not care "what type of leave because there was no leave to have to take."

On December 23, 1998, LTC Ammel asked plaintiff to staff a document.   Plaintiff advised LTC Ammel that it was a holiday week, many people were on leave and there were very few

employees around the office to talk to about the project.   According to plaintiff, LTC Ammel "wouldn't take this as answer" and "went on and on about how [she] wouldn't do it."   On December 30, 1998, LTC Ammel asked plaintiff whether she was at work on Monday, December 28 and Tuesday, December 29 and plaintiff replied that she was not.   He then asked whether plaintiff planned to come to work on Thursday, December 31 and plaintiff stated that she intended to work that day.   LTC Ammel also asked whether she intended to work on Friday of that week and she replied that she did not. When LTC Ammel asked her why she did not plan on working, she replied that it was New Year's Day.   Later that day, LTC Ammel talked to plaintiff "in a boisterous tone" about plaintiff's failure to format properly a document.   Beginning in January 1999, LTC Ammel continuously sent plaintiff e-mails following up on tasks that he had just asked her to do.   He also sent plaintiff numerous "reminder" e-mails immediately after giving plaintiff a particular task to do.   On January 12, 1999, LTC Ammel and plaintiff were discussing a project and LTC Ammel spoke to plaintiff in a demeaning and degrading manner in front of two coworkers.   On January 13, 1999, plaintiff visited an EEO counselor regarding the incidents described above and these incidents were ultimately set forth in plaintiff's April 19, 1999 EEO complaint.

In March 1999, LTC Ammel issued plaintiff a letter of counseling regarding her performance.   In April 1999, plaintiff requested Priority Placement for transfer, citing the ongoing problems and discrimination she believed she was experiencing with LTC Ammel.   On June 28, 1999, LTC Ammel issued plaintiff an unsuccessful performance appraisal for the period July 2, 1997 through May 1, 1999.   She received the lowest possible rating on her evaluation.   Plaintiff had received the highest possible rating on her two previous evaluations and those were completed

by supervisors other than LTC Ammel.

On August 2, 1999, defendant, based on a recommendation from its EEO office, proposed to reassign plaintiff to a different position so that LTC Ammel would no longer hold a supervisory role with respect to plaintiff.   Plaintiff objected to the particular reassignment proposed by defendant.   On August 6, 1999, plaintiff filed her second EEO complaint, alleging that LTC Ammel gave her an unsuccessful performance appraisal in June 1999 in retaliation for her prior EEO complaint and/or because of her sex.   Later than month, defendant reassigned plaintiff to a position of equal grade and pay.   Thereafter, plaintiff received fully satisfactory–even superior–performance ratings from her supervisors.   She remains employed by defendant today.

Additional facts will be provided as they related to plaintiff's particular claims.

## II.   Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).   Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).   In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.   *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).   An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."  *Id*. (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.  *Id.* (citing Fed. R. Civ. P. 56(e)).  To accomplish this, sufficient evidence pertinent to the material issue  "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III.    Claims Allegedly Barred by Negotiated Grievance Procedure

Defendant moves for summary judgment on certain claims on the grounds that plaintiff filed a grievance under the negotiated agreement with the union concerning these claims. According to defendant, then, plaintiff's decision to submit these claims to the grievance process bars her from pursuing those claims in this forum. *See* 29 C.F.R. § 1614.301(a) (federal sector employee may elect to submit claims to negotiated grievance procedure or may raise claims in EEO complaint, but not both). Specifically, defendant contends that plaintiff filed a grievance concerning the allegations set forth in paragraphs 10, 11, 14 and 15 of her first EEO complaint, namely that LTC Ammel spoke to her in a boisterous manner in late October 1998 or early November 1998 regarding her position description and standards; that LTC Ammel threatened to reschedule plaintiff's flight during a November 1998 discussion about her standards; that LTC Ammel included in the standards for plaintiff's position the requirement that plaintiff "replicate documents and mail them as needed" and then advised plaintiff that she was good at doing that kind of work but nothing else; and that LTC Ammel advised plaintiff that he wanted her to finish the standards for review by the close of business, but he returned just one hour later and expected the standards to be finished then.

In support of its argument, defendant directs the court to the affidavit of Janice Sifford, a human resources specialist employed at the Fort Leavenworth Civilian Personnel Advisory Center. Ms. Sifford describes the contents of plaintiff's grievance and it includes none of the allegations included in plaintiff's EEO complaint. Rather, Ms. Sifford's affidavit indicates that plaintiff grieved the fact that she did not receive an annual performance appraisal in 1998; the fact that no performance objectives were in place for her position as of October 31, 1998; the fact that her

job description was "improper"; and the lack of a Standard Form (SF) 52 documenting her earlier transfer from the Integration Division to the Training Division.   As defendant's evidence does not show that plaintiff elected to file a grievance on the claims that defendant contends, defendant is not entitled to summary judgment on this basis.[2]

## IV.     Sex Discrimination and Retaliation Claims

As an initial matter, defendant moves for summary judgment to the extent plaintiff asserts claims of sex discrimination and retaliation based on discrete acts occurring more than 45 days prior to January 13, 1999, the date that plaintiff visited with an EEO counselor.   *See* 29 C.F.R. § 1614.105(a) (federal-sector plaintiff alleging discrimination must contact an EEO counselor within 45 days of the alleged discriminatory act).   According to defendant, then, any claims of sex discrimination or retaliation based on discrete acts occurring prior to November 28, 1998 must be dismissed.   The court agrees that summary judgment on these claims is mandated under the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).   *See Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (unexhausted claims

---

[2]In its reply, defendant asserts that it is entitled to summary judgment for the additional reason that plaintiff failed to address in any manner defendant's argument concerning the claims that had been submitted to the grievance procedure.   According to defendant, then, summary judgment should be granted on this argument as it is unopposed.   Because defendant failed to meet its initial responsibility of demonstrating the absence of a genuine issue of material fact and that it is entitled to summary judgment as a matter of law, the court rejects the approach suggested by defendant.   *See Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002) (summary judgment is not proper merely because the opposing party failed to file a response; moving party must first satisfy its initial burden under Rule 56(c)).

involving discrete employment actions no longer viable; *Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own "unlawful employment practice" for which administrative remedies must be exhausted). Plaintiff, then, can assert sex discrimination and retaliation claims based only on those acts occurring after November 28, 1998. For this reason, plaintiff's sex discrimination and retaliation claims based on her November 16, 1998 counseling and any other discrete acts that took place prior to November 28, 1998 are dismissed.

Plaintiff asserts timely claims of sex discrimination based on specific conduct engaged in by LTC Ammel, including sending plaintiff numerous "follow up" and "reminder" e-mails concerning tasks he had recently assigned to plaintiff; speaking to her in a demeaning and degrading manner on January 12, 1999; questioning plaintiff about her work schedule on December 30, 1998; speaking to her in a "boisterous" tone about her failure to format a document correctly; pushing for work to be done during the holiday week; questioning plaintiff about what type of leave she intended to take on Christmas eve; attempting to implement a sign-in sheet for plaintiff; and giving plaintiff an unsuccessful performance appraisal in June 1999. Plaintiff asserts a timely claim of retaliation based on her June 1999 performance appraisal and also suggests that the totality of LTC Ammel's conduct toward her demonstrates a pattern of retaliatory harassment.[3]

---

[3]Plaintiff also appears to assert a claim of sex discrimination and retaliation based on her August 1999 involuntary reassignment. These claims, however, are barred based on plaintiff's failure to exhaust her administrative remedies, as it is undisputed that plaintiff never filed an EEO complaint based on her reassignment. *See Martinez v. Potter*, 347 F.3d 1208,

To establish a prima facie case under Title VII, plaintiff must show, among other things, that she suffered an adverse employment action.  *See Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004).  Summary judgment is appropriate on all of plaintiff's discrete claims of sex discrimination because those claims are based on acts that do not rise to the level of an "adverse employment action" for purposes of Title VII liability.  An adverse employment action "must be materially adverse to the employee's job status. . . .  The adverse action must amount to a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Duncan v. Manager, Dep't of Safety, City & County of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005) (quoting *Meiners v. University of Kansas*, 359 F.3d 1222, 1230 (10th Cir. 2004)).  Putting aside for the moment plaintiff's June 1999 performance appraisal, none of LTC's Ammel's acts alleged by plaintiff materially affected her employment status in any way.   These acts may have made her work environment unpleasant, but they are insufficient to support a sex discrimination claim.   *See id.*   While plaintiff contends that these acts affected her "future employment prospects," she directs the court to no evidence supporting her conclusory statement.

Moreover, plaintiff has failed to raise a genuine factual dispute concerning whether her June 1999 performance appraisal constitutes an adverse employment action for purposes of Title VII liability.   The Tenth Circuit has held, albeit in an unpublished opinion, that a negative

1211 (10th Cir. 2003) (Supreme Court's decision in *Morgan* applies equally to claims based on discrete acts occurring after the filing of an EEO complaint; plaintiff must exhaust each claim).

performance evaluation can constitute an adverse employment action in certain circumstances. *See Toth v. Gates Rubber Co.*, No. 99-1017, 2000 WL 796068, at *9 (10th Cir. June 21, 2000). In *Toth*, the Circuit held that the plaintiff suffered an adverse employment action for purposes of her Title VII retaliation claim when she received negative performance evaluations that ultimately resulted in her discharge. *See id.* In other words, because those performance evaluations had an "adverse impact on [plaintiff's] future employment opportunities," they were sufficient to constitute adverse employment actions. *See id.*

By contrast, plaintiff has not shown that her unsuccessful appraisal had any bearing on her job status. Her pay grade and salary remained the same. She was not placed on any type of probationary status. She does not point to any promotion or other benefit that she was allegedly denied due to the appraisal. While she claims that she was involuntarily reassigned after receiving the negative appraisal, the undisputed facts demonstrate that plaintiff's reassignment was in no way related to the performance appraisal. Rather, defendant decided to remove plaintiff from LTC Ammel's supervision because of the nature of the allegations raised by plaintiff in her first EEO complaint. The record does not even suggest that the individual who made the decision to transfer plaintiff out from under LTC Ammel's supervision had any knowledge that plaintiff had received a negative appraisal. Moreover, once she was removed from LTC Ammel's supervision, plaintiff again received high performance evaluations, was clearly successful in her new assignment and she remains employed with defendant today. In such circumstances, plaintiff cannot demonstrate that her June 1999 performance evaluation constituted an adverse employment action. *See Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (holding that negative performance evaluation

14

was not an adverse employment action where employer did not take any other action against employee); *see also Dick v. Phone Directories Co.*, 397 F.3d 1256, 1270 (10th Cir. 2005) (affirming grant of summary judgment on retaliation claim based on written warning where plaintiff showed no harm to her future employment prospects and warning had no bearing on her likelihood of being fired); *Young v. White*, 200 F. Supp.2d 1259, 1274 (D. Kan. 2002) (written reprimand did not constitute adverse employment action in the absence of evidence that reprimand had any negative effect on plaintiff's employment; plaintiff remained employed by defendant three years after reprimand), *aff'd*, 2003 WL 21940941 (10th Cir. Aug. 14, 2003).

For the same reason that plaintiff cannot assert a sex discrimination claim based on her performance appraisal, her retaliation claim based on the appraisal also fails.   That leaves plaintiff's retaliatory harassment claim and the court rejects this claim as well.   Specifically, plaintiff cannot demonstrate that LTC Ammel's actions, taken together, constitute an "adverse employment action" as required to state a retaliation claim. In fact, the Tenth Circuit has repeatedly rejected retaliation claims based on facts that are similar to (and in some cases more egregious than) those set forth by plaintiff here.   For example, in *Stover v. Martinez*, 382 F.3d 1064 (10th Cir. 2004), the Circuit rejected a retaliation claim based on a supervisor's alleged retaliatory harassment of the plaintiff because the plaintiff failed to demonstrate that her supervisor's conduct amounted to an adverse employment action.   *See id.* at 1075.   In that case, the plaintiff alleged that she was moved to an isolated office; she received a performance evaluation lower than previous performance evaluations; she did not receive work commensurate with her experience; and she did not receive the recognition she believed she deserved for her

work on specific projects.  *See id.*

Similarly, in *Amro v. Boeing Co.*, 232 F.3d 790 (10th Cir. 2000), the Circuit rejected a retaliatory harassment claim despite evidence that the plaintiff's supervisor, after attending a meeting in which the plaintiff advised his supervisor that he thought he was discriminating against him, called him a "fucking foreigner;" placed his hands around the plaintiff's neck and patted him down, apparently to ascertain whether the plaintiff had a tape recorder; threw drawing papers at the plaintiff, causing a paper cut on plaintiff's neck; demanded to search through a folder that the plaintiff was carrying; and, on two other occasions, spoke unpleasantly to the plaintiff.  *See id.* at 795.   According to the Circuit, the "unpleasant and vulgar" encounters that the plaintiff had with his supervisor were simply not "sufficiently negative and pervasive to create an adverse employment action."  *See id.* at 798.

Finally, in *Sanchez v. Denver Public Schools*, 164 F.3d 527 (10th Cir. 1998), the Circuit again affirmed the district court's grant of summary judgment to the defendant on the plaintiff's retaliatory harassment claim where the plaintiff failed to demonstrate that her supervisor's conduct amounted to an adverse employment action.  *See id.* at 533. The plaintiff in *Sanchez* alleged that her supervisor, in retaliation for plaintiff's filing an EEOC complaint, made several ageist remarks; required her (but no one else) to bring a doctor's note when she was sick; threatened to write her up for insubordination; and threatened to put her on a plan for improvement.  *See id.* Analyzing these allegations, the Circuit stated:

> This conduct simply does not rise to the level of a materially adverse employment action sufficient to satisfy the second prong of the prima facie case. Courts considering the issue have held that "'unsubstantiated oral reprimands' and

> 'unnecessary derogatory comments'" such as those alleged here are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status. . . . .   It follows that "not everything that makes an employee unhappy" qualifies as retaliation, for "otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'"

*See id.* (citations and quotations omitted).

Like the factual contexts of the cases described above, plaintiff here has failed to present sufficient evidence from which a reasonable jury could conclude that she suffered an adverse employment action.   While LTC Ammel's evaluation of plaintiff's performance, his demeaning words and tone of voice, his suggestion that she (and no one else) sign in each morning, his attempt to assign her tasks that were not commensurate with her education and experience, and the overall disrespect that he allegedly showed plaintiff may have made the work environment an unpleasant one for plaintiff, LTC Ammel's actions are insufficient to state a claim of retaliatory harassment.  *See Stover*, 382 F.3d at 1075.[4]

For the foregoing reasons, summary judgment is appropriate on plaintiff's claims of sex discrimination and retaliation.

## V.    Hostile Work Environment Claim

In its motion for summary judgment, defendant contends that the court, in analyzing

---

[4]Even assuming arguendo that the hostility of which plaintiff complains rises to an actionable level, plaintiff has nonetheless failed to establish a genuine issue as to whether that hostility resulted from her complaints of discrimination.

plaintiff's hostile work environment claim, cannot consider any allegations of conduct occurring more than 45 days prior to the date that plaintiff visited with an EEO counselor because those allegations are untimely.    *See* 29 C.F.R. § 1614.105(a) (federal-sector plaintiff alleging discrimination must contact an EEO counselor within 45 days of the alleged discriminatory act). According to defendant, then, any allegations of hostile work environment sexual harassment or sex discrimination occurring prior to November 28, 1998 must be dismissed.    As explained below, the court rejects defendant's argument and will consider all of plaintiff's allegations in analyzing the merits of her hostile work environment claim.

In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court held that as long as "an act" contributing to a hostile work environment took place no more than 300 days before the plaintiff filed an EEOC charge (or, as applied to this case, no more than 45 days before the plaintiff visited with an EEO counselor[5]), a court may consider the complete history of acts comprising that hostile work environment.    *See Duncan v. Manager, Dep't of Safety, City & County of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005).    As the Tenth Circuit summarized in *Duncan*, *Morgan* explains that when analyzing a hostile work environment claim spanning longer than 300 days (or, here, longer than 45 days) "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work

---

[5]While the Supreme Court in *Morgan* did not address whether the rule announced therein would apply to cases arises out of the federal sector, both parties assume that the continuing violation doctrine as described in *Morgan* would apply in the federal sector context.  In the absence of any authority suggesting otherwise, the court accepts the parties' assumption.  *See Zinke v. Slater*, 2002 WL 849315, at *4 (10th Cir. May 3, 2002) (analyzing continuing violation doctrine in federal sector context).

environment practice, and if so, whether any act falls within the statutory time period." *See id.* (quoting *Morgan*, 536 U.S. at 120). *Morgan* emphasizes that there must be a relationship between acts alleged after the beginning of the filing period and the acts alleged before the filing period: "if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act." *See id.* at 1308-09 (quoting *Morgan*, 536 U.S. at 118). *Morgan* holds that a series of alleged events comprises the same hostile environment where "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *See id.* at 1309 (quoting *Morgan*, 536 U.S. at 120).

The court's task, then, is to determine if there is a genuine issue whether the acts plaintiff alleges are part of the same hostile work environment. *See id.* To determine whether these acts are part of the same hostile work environment, *Morgan* advises looking at the type of these acts, the frequency of the acts, and the perpetrator of the acts. *See id.* (citing 536 U.S. at 120). Applying this standard, a reasonable jury could conclude that the acts plaintiff alleges are part of the same hostile work environment. Significantly, all of the acts about which plaintiff complains are related by type, frequency, and perpetrator. *See id.* According to plaintiff, LTC Ammel engaged in a continuing course of demeaning and degrading conduct directed toward plaintiff based on her sex. The acts took place over a relatively short period of time and the acts occurred consistently and frequently during that time frame. In short, plaintiff has introduced sufficient facts to raise a

triable issue on whether LTC Ammel engaged in a continuing course of discrimination such that the court must consider the incidents that occurred prior to the 45-day time limitation. *Compare id.* at 1309 (no reasonable jury could conclude that acts alleged by plaintiff were part of the same hostile work environment where acts spread out over 18-year period and the acts that occurred within the filing period were committed by a completely different set of actors than the acts that occurred prior to the filing period) *with Martin v. Nannie & the Newborns, Inc.,* 3 F.3d 1410, 1415-16 (10th Cir. 1993) (plaintiff raised triable issue on scope of hostile work environment claim where all acts involved sexual harassment and occurred consistently and frequently over the course of twenty-month period of employment).

Defendant asserts that the continuing violation theory is inapplicable to these facts because the only acts that were in any way "sexual" in nature (*i.e.*, LTC Ammel's use of terms like "honey," and "darling" and his touching plaintiff) occurred prior to the 45-day time limitation. According to defendant, then, the only acts that occurred within the limitations period were clearly "non-sexual" in nature and, thus, are not related in any way to acts outside the limitations period. The court rejects this argument. The mere fact that most of the conduct occurring within the limitations period appears gender-neutral does not mean that it is not related to prior gender-specific conduct. *See, e.g., Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (conduct that appears gender-neutral in isolation may in fact be gender-based, but may appear so only when viewed in the context of other gender-based behavior). Moreover, plaintiff's allegations, if true, tend to suggest a continuing course of demeaning treatment on the part of LTC Ammel, irrespective of whether LTC Ammel ceased touching plaintiff and ceased referring to her by

gender-based terms.     Thus,  the  acts  within  and  outside  the  limitations  period  are  sufficiently related for purposes of the continuing violation doctrine.

Having  found  that  plaintiff  has  provided  sufficient  facts  to  demonstrate  that  there  is  a genuine  issue  of  material  fact  concerning  the  existence  of  a  continuing  violation,  the  court proceeds  to  determine  whether  all  the  incidents  alleged,  including  those  within  and  outside  of  the limitations  period,  are  sufficient  to  establish  a  hostile  work  environment  claim.   Title  VII  prohibits "discriminat[ion]  against  any  individual  with  respect  to  his  compensation,  terms,  conditions,  or privileges  of  employment,  because  of  such  individual's  .  .  .  sex."   *Id*. at 832 (quoting 42 U.S.C. § 2000e-2(a)(1)).   In  *Meritor  Savings  Bank,  FSB  v.  Vinson*, 477 U.S. 57, 66 (1986), the Supreme Court  held  that  "a  plaintiff  may  establish  a  violation  of  Title  VII  by  proving  that  discrimination based on sex has created a hostile or abusive work environment."   *Id.*  Not all harassment, however, creates  a  hostile  work  environment;  the  harassment  must  be  "sufficiently  severe  or  pervasive  to alter  the  conditions  of  [the  victim's]  employment."    *Id.* (quoting *Meritor*, 477 U.S. at 67).   Severity and  pervasiveness  are  evaluated  according  to  the  totality  of  the  circumstances,  *Harris  v.  Forklift Sys.,  Inc.*, 510  U.S.  17,  23  (1993),  considering  such  factors  as  "the  frequency  of  the discriminatory  conduct;  its  severity;  whether  it  is  physically  threatening  or  humiliating,  or  a  mere offensive  utterance;  and  whether  it  unreasonably  interferes  with  an  employee's  work performance."   *Id.* at 832-33 (citations and quotations omitted).   But severity and pervasiveness are  not  enough;  the  plaintiff  must  also  "produce  evidence  that  she  was  the  object  of  harassment because of her gender."   *Id*. at 833 (quoting *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998)).   Title VII is not a code of workplace conduct, nor was it "designed

to bring about a magical transformation in the social mores of American workers." *Id*.  Title VII targets discrimination.  Thus, a hostile environment claim requires a showing not only of severe and pervasive harassment, but of severe and pervasive harassment based on gender.

Defendant moves for summary judgment on the merits of plaintiff's hostile work environment claim on the grounds that plaintiff has failed to demonstrate that LTC Ammel's conduct was "based on sex" and that plaintiff has failed to demonstrate that LTC Ammel's acts were severe or pervasive.  At the outset, the court notes that this case presents a very close case on summary judgment.  Ultimately, however, the court believes that plaintiff is entitled to have a jury resolve her hostile work environment claim.  Plaintiff alleges a number of gender-based incidents or incidents that have gender-related implications.  *See Riske v. King Soopers*, 366 F.3d 1085, 1091 (10th Cir. 2004) (in analyzing whether conduct is based on sex, court begins with evidence of conduct that is overtly gender-based or  has gender-related implications).  LTC Ammel referred to plaintiff as "honey" and "darling" on multiple occasions.  Viewing the evidence in the light most favorable to plaintiff, LTC Ammel refused to treat plaintiff like an action officer and, instead, treated her like a secretary.  He frequently assigned plaintiff–significantly, the only female under his supervision for the vast majority of the relevant time period–tasks that were consistent with the traditional role of a secretary and inconsistent with her position and level of experience.  He requested her attendance at a meeting for the purpose of typing minutes and he essentially told her that she was only competent to type and to photocopy documents.  When plaintiff asked LTC Ammel to treat her like an action officer rather than an administrative employee, he responded that she was "too sensitive."  A reasonable jury could readily find these

acts and comments to be related to gender or sexual animus.

While the amount of gender-based or gender-related conduct alleged by plaintiff may not be voluminous, she alleges a more substantial amount of gender-neutral conduct that, when viewed in the context of the evidence described above, can support a finding of gender-animus sufficient to sustain a hostile work environment claim.   *Chavez*, 397 F.3d at 833 (plaintiffs can use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct on summary judgment).   The incidents of arguably gender-neutral harassment include refusing to permit plaintiff to perform the work of an action officer on various projects; routinely skipping over plaintiff in staff meetings; failing to keep plaintiff apprised of work-related issues; publicly questioning plaintiff's back injury; refusing to respond adequately to plaintiff's work-related queries; proposing that plaintiff (but no one else) sign in each day; and generally speaking to plaintiff in a demeaning and intimidating manner on numerous occasions.   In light of plaintiff's allegations of some gender-based conduct, a reasonable jury could conclude that these examples of facially gender-neutral acts were also gender-based.   *Id*. at 834-35 (giving plaintiff tasks outside her job description, demeaning her intelligence and taking away job duties she regularly performed could be construed as gender-based in light of other, overtly gender-based conduct); *O'Shea v. Yellow Technology Servs*., Inc., 185 F.3d 1093, 1101 (10th Cir. 1999) (jury could conclude that supervisor's failure to communicate adequately with plaintiff regarding work matters and yelling at plaintiff in a demeaning and unprofessional manner would not have occurred but for plaintiff's sex).   In summary, the court believes that a reasonable jury could view all of LTC

Ammel's allegedly harassing conduct as the product of gender hostility.[6]

Plaintiff has also established genuine issues of material fact regarding the pervasiveness of LTC Ammel's conduct. Viewing the evidence in the light most favorable to plaintiff, the record reflects that LTC Ammel began his allegedly harassing treatment of plaintiff as soon as he was assigned as plaintiff's supervisor. Throughout the next eighteen months, LTC Ammel continued his demeaning treatment of plaintiff unabated. He allegedly treated plaintiff like a secretary throughout the time she was under his supervision, frequently communicated with plaintiff in a condescending manner and made several overtly gender-based comments. Based on this evidence, a jury could reasonably conclude that, as a result of LTC Ammel's conduct, plaintiff was subjected to an environment "permeated with discriminatory intimidation, ridicule and insult." *See O'Shea*, 185 F.3d at 1102 (genuine issues of fact on pervasiveness where supervisor engaged in continuous demeaning conduct); *see also Smith v. Northwest Financial Acceptance, Inc.*, 129 F.3d 1408 (10th Cir. 1997) (evidence was sufficient to support a finding of pervasive harassment despite lack of "steady barrage of sexual comments"; cautioning that the word "pervasive" is not a counting measure and the trier of fact must utilize a broader contextual analysis).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for

---

[6]There is some evidence in the record that LTC Ammel treated other women with respect and that, at times, he treated both men and women in a demeaning and intimidating manner. While this evidence supports defendant's argument that LTC Ammel's conduct was not based on plaintiff's sex, plaintiff has come forward with sufficient evidence of gender-based conduct such that a jury must ultimately resolve the issue.

summary judgment (doc. 46) is granted in part and denied in part.


**IT IS SO ORDERED.**


Dated this 21st  day of June, 2005, at Kansas City, Kansas.



s/ John W. Lungstrum
John W. Lungstrum
United States District Judge